Haart v Scaglia (2023 NY Slip Op 50143(U))

[*1]

Haart v Scaglia

2023 NY Slip Op 50143(U)

Decided on February 27, 2023

Supreme Court, New York County

Borrok, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 27, 2023
Supreme Court, New York County

Julia Haart, Plaintiff,

against
Silvio Scaglia, PAOLO BARBIERI, JEFFREY FEINMAN, DDK & COMPANY, LLP, FREEDOM HOLDING, INC., Defendant.

Index No. 652373/2022

Plaintiffs by:
Anderson Kill, P.C., 1251 Avenue of the Americas, 42nd Floor, New York, NY 10020
Defendants by:
Orrick, Herrington & Sutcliffe LLP, 51 W 52nd St, New York, NY 10019
Hodgson Russ LLP, 605 Third Avenue, Suite 2300, New York, NY 10158

Andrew Borrok, J.

The following e-filed documents, listed by NYSCEF document number (Motion 005) 74, 75, 76, 77, 91, 93, 94, 95, 96 were read on this motion to/for DISMISS.
The following e-filed documents, listed by NYSCEF document number (Motion 006) 79, 80, 81, 82, 83, 92, 97, 98, 99 were read on this motion to/for DISMISS.
Upon the foregoing documents, Silvio Scaglia and Freedom Holding, Inc. (hereinafter, collectively, the Scaglia Defendants)'s motion (Mtn. Seq. No. 005) must be granted to the extent that Julia Haart's claims predicated on an alleged promise to make her a 50% owner of Freedom must be dismissed. This lawsuit is one of five between the parties, one of which was decided in Delaware after a two-day trial, and another of which is currently pending before another Justice of this court. Certain of the pending motions may be decided based on prior findings or rulings in those other actions.
As discussed below, the Delaware court (Zurn, Vice-Chancellor) has already considered Ms. Haart's claim that Silvio Scaglia promised to make her a 50% owner of Freedom Holdings, Inc. (Freedom) and rejected it because Ms. Haart failed to prove any actionable promise to make her a 50% partner:
Haart's defenses of ratification and acquiescence both fail because there was nothing to ratify or to which Scaglia could acquiesce Haart argues that by signing the ERA, and by his other statements, Scaglia ratified or acknowledged the parties' agreement to evenly split Freedom's shares. Her position is built on her incorrect reading of the ERA and [*2]other documents. Haart has not proven any agreement to evenly split Freedom's shares or voting power. Haart has failed to carry her burden to show that Scaglia ever transferred her half of Freedom's preferred shares or made an actionable promise to do so. She offers no transaction that Scaglia could ratify or acknowledge
(NYSCEF Doc. No. 31, at 42-43 [emphasis added]). In entering judgment for Mr. Scaglia on all counts following a two day trial that included over 300 joint exhibits, live testimony from three witnesses and deposition testimony from two other witnesses, the Court held that "the evidence reveals that Haart never owned an equal stake of Freedom's preferred stock" (id., at 3). As discussed below, the Delaware court considered nearly all of the allegations at issue in this lawsuit and made very specific factual findings which compel dismissal of the lion share of Ms. Haart's claims.
Dismissal of Ms. Haart's fraud claims is also required because the Stock Power (hereinafter defined) by its express terms indicates that it does not convey 50% of Freedom's preferred stock and that as such she can not have reasonably relied otherwise:
FOR VALUE RECEIVED, I, SILVIO SCAGLIA, residing at 70 Vestry Street, PHS, New York, NY 10013, do hereby sell, assign and transfer unto:
JULIA HENDLER HAART, residing at 70 Vestry Street, PHS, New York, NY 10013, Sixty One Thousand Eight Hundred Thirty Two (61,832) Shares of the One Hundred Twenty Three Thousand Six Hundred Sixty Five (123,665) Shares of the Preferred Stock of FREEDOM HOLDING, INC., standing in my name on the books of said Corporation represented by Certificate(s) No.(s) 101 herewith, and do hereby irrevocably constitute and appoint JEFFREY FEINMAN, CPA, as attorney-in-fact to transfer the said certificate on the books of the within named Corporation, with full power of substitution.in-the premises
(NYSCEF Doc. No. 58, ¶ 90 [emphasis added]). For completeness, Ms. Haart also is not entitled to assert fraud claims based on allegations that Mr. Scaglia never told her about the existence of the preferred stock and/or Mr. Scaglia retaining control over Freedom. As discussed below, having never made an actionable promise to make her a 50% partner of Freedom, it simply does not matter whether she knew about the preferred stock. In addition, on the record before the Court (and as discussed below and extensively in the Delaware Lawsuit), Mr. Scaglia transferred pre-marital assets to Freedom in exchange for voting control. Ms. Haart became CEO of EWG knowing this — i.e., that all of the assets came from Mr. Scaglia and received common stock after the parties were married. Thus, it does not matter that she found out about the preferred stock in the context of a potential SPAC or other deal with Gabelli Group Partners (Gabelli), Jeffries or someone else who did not include her in the negotiations because these companies had no plan of retaining her if the transactions were successful. (NYSCEF Doc. No. 31 at 12).
Put another way, the fraud claims which are predicated on this "promise" are not actionable because (x) the Delaware Court already held that there was no actionable promise, (y) there could be no reasonable reliance on the Stock Power because by its express terms it does not convey 50% of Freedom's preferred shares and (z) given the foregoing transfers by Mr. Scaglia, there simply was not actionable deception.
Therefore, based on collateral estoppel or res judicata the claims in this action for [*3]fraudulent inducement (first cause of action), fraudulent concealment (second cause of action), breach of contract (sixth cause of action) and promissory estoppel (tenth cause of action) against Mr. Scaglia must be dismissed. The Court notes additionally that Ms. Haart is not entitled to damages seeking a transfer of equity to make her a 50% partner in Freedom given that this is exactly the relief rejected by the Delaware court.
Mr. Scaglia is not however entitled to dismissal of the cause of action (fifth cause of action) seeking a declaration that Ms. Haart owns 61,832 shares (49.9995957%) of the preferred stock. The Delaware court specifically did not reach this issue because it did not have to do so. Having found that Ms. Haart is not a 50% owner, and having rejected the argument that the Stock Power ratified a promise to make her an equal partner (because Ms. Haart failed to prove an actionable promise to make her a 50% partner), there could be no deadlock or dissolution predicated on deadlock. As such, resolving whether the Stock Power otherwise was effective according to its terms in conveying stock to Ms. Haart was not relevant or necessary to the determination of the claims asserted in that action. Thus, it can not be said that Ms. Haart is barred from asserting this claim based on either collateral estoppel or res judicata. Nor is Mr. Scaglia entitled to dismissal based on his dubious assertion that he does not "remember" signing the Stock Power or that as the party who controlled the Board and whether such preferred interests were in fact certificated that no justiciable controversy exists simply because he did not cause any such stock certificates to be issued. 
Mr. Scaglia is also not entitled to dismissal of the claims sounding in breach of fiduciary duty. These claims were not part of the Delaware action because they are predicated on Mr. Scaglia's conduct which post-dates the events considered in the Delaware proceeding. Ms. Haart is at least an owner of 50 common shares of Freedom and as a minority shareholder of Freedom she is owed fiduciary duties. Any argument to the contrary is just wrong based on the record of the Delaware proceeding or the express documents at issue. Simply put, Ms. Haart alleges that Mr. Scaglia has used Freedom as his personal piggy-bank (ironically the same allegations he made against her in the Scaglia Lawsuit [hereinafter defined]) and stripped Freedom of $1.5 million and the SHS (hereinafter defined) ownership without corporate purpose and solely to deprive Ms. Haart, a substantial minority shareholder of Freedom (if the Stock Power is effective as it appears to be), of the value of such assets. This is sufficient to state claims sounding in breach of fiduciary duty (seventh cause of action) and conversion (eleventh cause of action). 
Ms. Haart's claim for unjust enrichment (ninth cause of action) also must be dismissed for the same reason her lawsuit in Delaware failed or because the claim otherwise is duplicative of her breach of fiduciary duty claim. Ms. Haart claims that she was not adequately compensated by the management fees that EWG paid to Freedom  i.e., that a CEO of her stature would typically receive an employment contract and that if none of this was a fraud (as she alleges that it was) that she should have been additionally compensated for the work she did. Although this claim was not before the Delaware court, it must nonetheless be dismissed. The management fees at issue were payable by EWG to Freedom — the company in which she claims she is, but for one-half share of the preferred stock owned by Mr. Scaglia, otherwise an equal partner. As such, the fees paid to Freedom enhanced the value of Freedom (and she received the benefit of the enhanced value in the reflective value of her equity). Thus, it can not be said that anyone has been unjustly enriched at her expense. And, to the extent she claims that Mr. Scaglia gets too much based on his preferred return, and that she is entitled to more — this is little more than her recycled claim that she is in fact a 50% partner. It matters not that she now calls it [*4]employment compensation because the basis for the stock award was respective of her employment in the first place and the basis for Mr. Scaglia's return is his economic investment. Lastly, to the extent that this claim is predicated on the lack of payout or Mr. Scaglia's unauthorized personal use of Freedom to pay for non-business-related expenses, these transfers form the basis for her breach of fiduciary duty claim. They are therefore duplicative and must be dismissed.
Jeffrey Feinman and DDK's (collectively, the Feinman Defendants) motion to dismiss (Mtn. Seq. No. 006) must be granted solely to the extent that the claims for fraudulent inducement (first cause of action), fraudulent concealment (second cause of action), and aiding and abetting fraud (third cause of action) must be dismissed. As discussed below, the Delaware Court previously determined that Ms. Haart in fact tried to pressure Mr. Feinman into lying that the Stock Power conveyed her a 50% interest in Freedom:
And the exercise of looking at the litigants' hands reveals dirt on Haart's. She was long aware of the Stock Power and the fact that Scaglia had one more preferred share than she did, going so far as to consult a lawyer who confirmed as much. While litigation loomed, she attempted to pressure Feinman into falsely stating Scaglia intended to transfer her fifty percent. Thereafter, she filed a petition in this Court, claiming she held half of Freedom's common shares, but neglected to mention preferred shares to her original counsel or the Court. The Amended Petition, filed by new counsel, indicated she owned half of "all classes of Freedom's stock." Haart testified she did not initially tell her replacement counsel about the Stock Power, on the theory that it was "irrelevant" until she found a copy of it
(NYSCEF Doc. No. 31, at 45-46 [internal citations omitted]).
Ms. Haart can not now retaliate against Mr. Feinman by suing him for fraudulent inducement (first cause of action) and fraudulent concealment (second cause of action). Because the fraud claims against the Scaglia Defendants must be dismissed, the claim for aiding and abetting fraud (third cause of action) must also be dismissed against the Feinman Defendants. However, the claim for aiding and abetting breach of fiduciary duty (eighth cause of action) is not ripe for dismissal. As alleged, the Feinman Defendants doctored the books and otherwise provided substantial assistance to Mr. Scaglia in using Freedom as his personal piggy-bank to the detriment of the minority shareholder, Ms. Haart, and in failing to issue the preferred stock which she claims the Stock Power conveyed to her.
The Relevant Facts and Circumstances
This appears to be at least the fourth of five lawsuits filed by Ms. Haart and Mr. Scaglia in the last few years — one filed in Delaware and four in New York — all involve their personal and business divorce. Two are resolved — the Delaware lawsuit (the Delaware Lawsuit, discussed extensively below) and a New York lawsuit (Index 650661/2022; the Scaglia Lawsuit), filed by Mr. Scaglia, Freedom, EWG, E1972 Inc against Ms. Haart a/k/a Julia Hendler and Haart Dynasty LLC. 
In the Scaglia Lawsuit, Mr. Scaglia alleged, among other things that (i) while Ms. Haart was CEO of EWG she engaged in gross overspending and misuse of corporate assets essentially using EWG "as her own personal piggy bank" (Index 650661/2022, NYSCEF Doc. No. 4, ¶16), [*5](ii) Ms. Haart asked that Freedom cause E1972 to invest in Ms. Haart's personal image but that she far exceeded the $2 million allocated for this by spending substantial sums on clothing, accessories and luxury vacations including from EWG and not just E1972 as had been authorized (id., ¶17-26), (iii) as a result of her gross overspending EWG's EBITDA plummeted from $6 million to negative $10.4 million and E1972's EBITDA was negative by nearly $5 million (id., ¶ 26-27), (iv) as a result of the gross overspending, the parties agreed that limits should place on withdrawals from the Freedom accounts at JP Morgan and that other than to cover a mortgage, rent and current living expenses, Ms. Haart and Mr. Scaglia could only each withdraw $250,000 (id., ¶ 28), (v) Ms. Haart soon thereafter immediately withdrew her $250,000 allocation (id., ¶ 29), (vi) on February 7, 2022, Mr. Scaglia emailed Ms. Haart an agenda for the EWG Board meeting which included as the first item "Dismissal of the CEO — for discussion and approval" based on (1) "the huge deterioration of the Company's profitability" since Haart's appointment; (2) the "huge increase in corporate costs and expenses attributable to the CEO office, well beyond the budgeted amounts," leading to steep losses; (3) the complete failure of Haart, despite two-years of attempts, to meet capital raising targets; and (4) the abysmal, loss-making performance of the company's digital division under Haart's leadership, even as the overall digital-marketing industry grew. (id., ¶ 29-32) and (v) following such removal, Ms. Haart 'retaliated' by "illegally" withdrawing $850,000 from Freedom's account at JP Morgan and transferred it to her company Haart Dynasty LLC and that despite being informated that such withdrawal was "illegal" she and Haart Dynasty LLC had not returned the funds (id., ¶ 30-35). As noted above, the Scaglia Lawsuit was dismissed pursuant to a fully executed stipulation of discontinuance with prejudice (Index 650661/2022, NYSCEF Doc. No. 56) on December 13, 2022.
The fifth lawsuit captioned Julia Haart v Silvio Scaglia et al, Index 158329/2022 (the Defamation Lawsuit) appears to be related to (i) the Scaglia Lawsuit in that it too seems to be centered around Mr. Scaglia's accusations that Ms. Haart took money and corporate property without authorization and (ii) the Matrimonial Action (hereinafter defined) in that it appears to be predicated on Ms. Haart's allegations that Mr. Scaglia made good on an actual 2021 threat (different from a threat which the court in the Matrimonial Action [Hoffman, J.] found that Ms. Haart had concocted) to retaliate about her in the press if she spoke badly about him. The Defamation Lawsuit is pending and the defendants in that case have filed a motion to dismiss. 
The Delaware and Matrimonial Actions
So far, and as discussed below, the only two courts that have reached the merits of any allegations between the parties have found that Ms. Haart has lied about (i) her relationship with Mr. Scaglia and various things Mr. Scaglia actually said to her, (ii) certain facts which form the basis of the claims in this lawsuit and (iii) otherwise either caused or attempted to cause others to lie on her behalf. The first such lawsuit was the Delaware Lawsuit (captioned Haart v Scaglia and Freedom Holding, Inc. and Elite World Group, LLC, C.A. No. 2022-0145-MTZ [NYSCEF Doc. No. 31]). The second such lawsuit was filed in New York, and is captioned Silvio Scaglia v Julia Haart, 365088/2022 (the Matrimonial Action). 
As noted, the Delaware Lawsuit rejected Ms. Haart's assertion that Mr. Scaglia had promised to make her a 50% owner of Freedom and that, as such, the ERAs (discussed below) could not have ratified any such alleged promise. The Delaware court also rejected Ms. Haart's assertion that the ERAs ratified any such promise because her explanation as to when any such [*6]ratification took place had to be false based on when she testified that such ratification occurred — i.e., before she alleged that she even became aware of the existence of the preferred stock! In addition, the court rejected Ms. Haart's argument that Mr. Scaglia had unclean hands and should be barred from arguing that she was not an equal owner of Freedom. Although the Delaware court noted that unclean hands could not bar Mr. Scaglia in that action from any claim he asserted (as he had not made any predicate claim to which he could be barred by the doctrine of unclean hands), the Delaware court specifically found that it was Ms. Haart, and not Mr. Scaglia, who had unclean hands based on her attempts to cause Mr. Feinman to lie in support of her assertion that she was a 50% owner of Freedom.
In the Matrimonial Action (which remains pending), the court (Hoffman, J.) found that Ms. Haart had lied to the family court in support of an application for a full order of protection (FOOP) that Mr. Scaglia had threatened to kill her and that Ms. Haart had her daughter testify falsely in support of her false accusations about Mr. Scaglia. Put another way, and as indicated above, two different jurists in two different jurisdictions have now made factual findings that Ms. Haart has lied about her relationship with Mr. Scaglia and either caused others to lie in support of her assertions or attempted to cause them to lie.
By way of background as to the court's (Hoffman, J.) findings in the Matrimonial Action, Ms. Haart had gone to Family Court and sought an ex-parte FOOP, among other things, barring Mr. Scaglia from their $65 million marital residence located at 70 Vestry Street. In support of her application and her allegations of fear of imminent death or bodily harm, she told the Family Court Judge that in in January 2022, Mr. Scaglia berated her with such menacing and dastardly comments at the marital home that her daughter found her cowering on the bathroom floor crying and naked. The court (Hoffman, J.) found that this simply was not true and that in fact Mr. Scaglia was in Mexico in January, 2022 when this incident allegedly "occurred":
In subparagraph d. of the petition, Wife states that on January 23, 2022, Husband came
into the bathroom while she was bathing "purple in the face and screaming, 'I hate your children and I hate this place.' He also said, 'I hate Shabbos (the Sabbath) and I don't want it in my house.'" In subparagraph g., Wife wrote: "In January 2021, while my daughter was at home, Respondent began screaming and yelling at me and refused to stop. He cornered me in a downstairs bathroom and continued his terrifying harangue as I cried and begged for him to stop. [My daughter] heard the commotion from upstairs and found me curled in a corner on the bathroom floor, naked and crying hysterically. [My daughter] told me later that she had called her sister during the episode to ask whether she should call the police because she was terrified as a result of Respondent's behavior." Wife testified that Husband yelled that he did not want her children at the marital residence and that he hated Shabbos (the Sabbath). If true, this by itself does not constitute a family offense. One important aspect of this testimony is that the incident actually occurred per Wife's testimony on January 23, 2021, not January 23, 2022. This was no innocent mistake. Wife utilized this alleged incident as part of her presentation to Family Court to obtain an emergency ex parte order of protection. It was only after Husband in an affidavit submitted as part of a motion stated and established that he was in Mexico on January 23, 2022 that Wife "corrected" her claim to reflect that the alleged incident occurred in January 2021
(Scaglia v Haart, Sup Ct, NY County, Aug. 11, 2022, Hoffman, J., at 7-8, 13-14 [emphasis added]).
In support of her petition, Ms. Haart adduced her daughter's testimony that Mr. Scaglia expressed his hostility towards Ms. Haart's children. This the court also found was demonstrably false:
The court does not credit Wife's daughter's testimony in material part During her testimony, the daughter stated that shortly after the parties were married, Husband made clear that he hated the children and wanted nothing to do with them. The WhatsApp messages during the pertinent time frame directly contradict this testimony. The messages are replete with mutual expressions of love and affection. Mr. Scaglia took Ms. Haart's daughter on spectacular trips, such as swimming with sperm whales in Dominica. As recently as June 2020, the daughter wrote to Mr. Scaglia that he was the greatest stepfather she could ever ask for, that she loved all of their adventures and was so grateful to have Mr. Scaglia in her life. Husband, in turn, wrote to Ms. Haart's daughter that he was lucky to have her and her siblings as step-children and that they make his life much richer and happier. The daughter texted in response, " back at you Silvio!". Questioned about material omissions in her affidavit in support of the family offense petition, the daughter explained that she was rushed on February 10, 2022 because she and her mother wanted to file to stop Husband from coming into Vestry Street and taking things. Later the witness acknowledged that it took one or two days working with her mother's attorney to draft the affidavit
(id., at 20 [emphasis added]).
To be clear, the court also found that Ms. Haart's daughter falsely made statements in support of Ms. Haart's accusation that Mr. Scaglia committed a family offense by sending someone to break into the marital home and removing two paintings from one floor:
With respect to Wife's allegations that Husband's agents broke a lock to remove the
paintings, the daughter, who allegedly had first-hand knowledge of the events (she testified that she allegedly discovered a broken lock and missing art after waking up one morning), could not reasonably explain the time frame surrounding the alleged broken locks or why she did not immediately notify her mother of the alleged break-in, explaining that her mother was probably "in a meeting or sleeping or something ". The daughter facilitated Netflix filming the aftermath of the alleged break-in, but Wife did not file a police report about the "burglary" until many hours later. The daughter allegedly did not know who took the paintings, but neither told the police nor her mother promptly after discovering the alleged break-in. Asked by the court what she was thinking when she discovered the break-in, as her mother may have been asleep, the witness allegedly did not know who came in and took the paintings, and whether she might have been concerned that whoever broke into the home, perhaps someone off the street, remained in the large home, daughter responded that she was no longer concerned because she put the lock back on the room from which the paintings were removed.
Upon cross-examination, the daughter testified that when she speaks about a specific
"fact" as a paid "influencer" on social media, some of the things that she posts on social media are not exactly true, as in this arena the concept of fact is fluid [*7]in nature and conveys a general concept, "an image that you sell," rather than a precise statement of events. Although the court understands this witness's loyalty to her mother, the court does not credit the material aspects of this witness's testimony
(id., at 21 [emphasis added]).
The court also found that Ms. Haart had lied that Mr. Scaglia had threatened to "kill her" because a 49-minute audiotape recording of the couple's fight revealed that this is not what occurred. What actually occurred is that Mr. Scaglia indicated that if Ms. Haart said bad things about him in the press, he would retaliate by saying bad things back:
In the hearing in Family Court in February 2022, in response to the Family Court Judge's request for information as to what occurred during the past month, Wife stated that everything she placed in the family offense petition was true and that she had proof of everything. Very importantly, Ms. Haart told the Family Court Judge that Mr. Scaglia threatened to kill her. In fact, the threat was to kill her in the press if Ms. Haart said bad things about him to the press. Although it appears from the transcript that Ms. Haart wanted to add the phrase about the press orally, as opposed to her misleading petition in this regard, the Judge then stated that she would grant the temporary order of protection and neither Wife nor her counsel sought to correct the record. The court listened to all 49 minutes of each spouse disparaging the abilities and
personality of the other spouse in a non-stop dialogue. The tape made clear that Wife was a strong, independent, forceful person who exhibited no fear whatsoever of Husband, and who dominated the conversation/argument with Husband. On the audiotape, Wife and Husband exchanged insults without pause, focusing upon the shortcomings of the business acumen of one another, as well as upon what they disliked about the other and/or the other spouse's family and personal foibles. Neither party gave ground, compromised or walked away. Husband tried his best to keep up his side of the constant exchange of negative comments. There was no fear exhibited by either party and no intimidation, certainly not of Wife. The 49-minute mutual nonstop harangue on the audiotape makes clear that after Wife stated to Husband that she could go public with allegations against him, Husband stated that he would "kill her" in the press, a threat that he appears intent upon carrying out. Such a threat, in the context of a quarrel of this nature, and in the broader context of a now-bitter public divorce, does not constitute a threat sufficient to constitute any of the enumerated family offenses, and does not justify an order of protection
(id., at 14-16).
The court further commented that Ms. Haart's shifting explanations for her fabrications underscore that they were only created to cobble together a fake emergency so that she could obtain an order of protection:
Similarly, Husband accurately points out that Wife's family offense claims changed in a meaningful manner from pleading to pleading and affidavit to affidavit. Again, in part to obtain the temporary order from Family Court excluding Husband from the marital residence, Wife averred in her family offense petition that in the "past few [*8]weeks", Husband's behavior was irrational. This allegation was simply false both substantively and temporally. There was no irrational or terrifying behavior by Husband in the weeks preceding the filing of the family offense petition. These allegations about the "past few weeks" disappeared from Wife's subsequent papers (without, however, an acknowledgment of their deletion or an explicit correction) within a month and were not raised in subsequent pleadings, motion papers or direct testimony
(id., at 14 [emphasis added]).
As noted, the Matrimonial Action is pending and the court had this action transferred to the Commercial Division (notwithstanding that the Scaglia Lawsuit had been transferred to the matrimonial part by the court [Crane, J.]) given the existence of the Matrimonial Action and in the interest of judicial economy.
Background of the Dispute
As discussed in the Delaware Lawsuit and as gleaned from the pleadings, Mr. Scaglia is an Italian entrepreneur and investor whose interests "span from technology to fashion" (NYSCEF Doc. No. 31, at 4). Among other interests, in 2011, Mr. Scaglia invested in the "Elite" brand through his holding company, S.M.S. Finance S.A. (id.). Separately, Mr. Scaglia owned La Perla and served as its CEO. In 2015, Mr. Scaglia and Ms. Haart met during a cobranding project between La Perla and Ms. Haart's company, Julia Hart Shoes (id.). Thereafter, Ms. Haart became a designer at La Perla and in 2016, became La Perla's creative director (id.). Ms. Haart and Mr. Scaglia began dating and got engaged in 2018. On or about this time, Mr. Scaglia sold La Perla and the buyer removed Ms. Haart from her role as creative director (id.). Subsequently, in anticipation of their marriage, Mr. Scaglia and Ms. Haart discussed owning and running Elite together which they hoped would attract public investment via a SPAC transaction (id.). To accomplish these goals, Mr. Scaglia modified the ownership structure. He formed Freedom as a holding company for business ventures and personal investments and had Freedom hold the interests in EWG and he would restructure Elite under EWG (id.).
Mr. Scaglia formed Freedom in November 2018 and the formation documents provided that Freedom would be managed by a board and have a single class of common stock (id.). Mr. Scaglia was Freedom's sole director and stock holder when it was formed. Freedom held the company's personal assets like their apartment and vehicles (id.). Thereafter, Freedom acquired Mr. Scaglia's interest in S.M.S. Finance, thereby indirectly holding numerous international entities that operate as Elite (id.). Mr. Scaglia contributed his interest in S.M.S. Finance and a loan agreement with S.M.S. Finance to Freedom and received voting control over Freedom (id.). To wit, on December 28, Freedom adopted an amended certificate of incorporation which empowered Freedom to issue 123,665 new shares of preferred stock which are convertible to common stock and which hold votes equal to the number of whole shares of common stock into which their preferred stock is convertible (id.). Freedom entered into a contribution agreement with Mr. Scaglia pursuant to which he contributed his S.M.S. Finance interests in exchange for all 123,665 share of Freedom preferred stock and Freedom created a wholly owned subsidiary to hold the Elite business (id.).
On January 24, 2019, Freedom formed EWG. Two months later, in March, 2019, Ms. [*9]Haart became EWGs' CEO replacing Paolo Barbieri (id.). In other words, at the time Ms. Haart became CEO of EWG she owned no common or preferred stock in Freedom. In June 2019, Mr. Scaglia and Ms. Haart married. Shortly thereafter, on July 8th, Mr. Scaglia executed stock certificates that transferred 50 of the 100 commons shares of Freedom's stock (id.). At this time, although the parties each owned 50% of the common stock, it is undisputed that Mr. Scaglia owned 100% of the preferred stock.
However, Ms. Haart alleges that she understood the transfer to her of the 50 common shares to be 50% of the total ownership of Freedom. To wit, she alleges that Mr. Scaglia had promised to make her a 50% partner and that she understood and expected that the transfer of this 50% of Freedom's common stock was done with the intent and effect of making her an equal partner. She further alleges in this lawsuit that Mr. Scaglia fraudulently concealed the existence of the preferred shares from her.
Subsequently, the parties entered into several entity restructuring agreements (the ERAs) in November 2019 and September 2020 (which were backdated April 2019), Section 1.1 of which provides for transferring of the membership interests in EWG to Freedom:
The Shareholders agree to transfer all of their Membership Interests in ELITE [EWG] to their wholly [sic] Delaware corporation known as FREEDOM, and thus change the structure of ownership such that FREEDOM shall be owned 50% by each shareholder, and FREEDOM shall own all of the Membership Interests in ELITE [EWG], which in turn shall own all of the stock in the ENTITIES
(NYSCEF Doc. No. 31, at 33).
In 2020, Freedom negotiated with Gabelli over a possible SPAC transaction for Elite (NYSCEF Doc. 31, at 12). Gabelli had no intention of retaining Ms. Haart as CEO if a SPAC deal closed and Ms. Haart was thus generally excluded from the negotiations although Mr. Scaglia apparently forwarded her emails from time to time (id.). She was "frustrated that she was not included in the discussions and that they downplayed her significance to the enterprise" (id.). It was in the context of these negotiations that Ms. Haart learned about the preferred shares and that Mr. Scaglia owned all of them:
During these negotiations, Haart learned for the first time that Freedom preferred shares existed, and that Scaglia owned all of them. Haart testified she was "devastated" to learn that Scaglia had "misled and lied to [her]" and that he could make decisions for the business, including selling it to Gabelli, without her. Haart's discovery of Freedom's capital structure compounded her frustration from being excluded from the Gabelli negotiations. On April 5, she wrote:
The fact that he has no interest in meeting me or even speaking w me says everything. No matter what the original thing that bothers him is . It's shocking to want to speak to the CFo , heads of just very specific agencies and not even once meet or speak to the CEO . It's not normal . If I had really been your partner as I thought ...if we were really 50/50 I would have been included from day 1 . I would have met him . He would have respected me and included me and I wouldn't be such a nonentity . You don't buy a company and not ask to meet or speak to the CEO . It's not normal . If you had included me from day 1 this wouldn't be the care
You chose to keep me out of it . I asked many times to meet him
And you told me no
That is not right . I do not deserve to be treated like I don't matter .
(id., at 14 [international citations omitted]).
When Ms. Haart learned of the Freedom preferred stock in 2020, she alleges that she and Mr. Scaglia had a big fight. She further alleged in the Delaware Lawsuit that Mr. Scaglia apologized, and as part of this apology, Mr. Scaglia signed documents where she understood that he was transferring 50% of the Freedom preferred stock to her and now finally making good on his promise to make her an equal partner. This explanation the Delaware Court considered and rejected:
Specifically, Haart testified that the ERAs transferred the preferred stock as Scaglia's apology. This is chronologically impossible: Haart did not learn about the preferred stock until March 2020, months after the 2019 ERA was executed. Id. 132. And as explained below, the 2020 ERA was largely unchanged and was executed to correct errors in the 2019 ERA. Haart's testimony that Scaglia used the ERAs to apologize to Haart is not credible. And in any case, Haart's understanding of the documents' purpose does not change or overcome their plain meaning
(NYSCEF Doc. No. 31, at 14, n 56 [emphasis added]).
Ultimately, however, Ms. Haart alleges that Mr. Scaglia executed the Stock Power, dated June 12, 2020 which she indicates further perpetuated the fraud because she understood it to transfer 50% of Freedom's preferred stock. However, the Stock Power by its express terms does not do this. On its face, it transfers one share less than 50% of Freedom's preferred stock:
FOR VALUE RECEIVED, I, SILVIO SCAGLIA, residing at 70 Vestry Street, PHS, New York, NY 10013, do hereby sell, assign and transfer unto:
JULIA HENDLER HAART, residing at 70 Vestry Street, PHS, New York, NY 10013, Sixty One Thousand Eight Hundred Thirty Two (61,832) Shares of the One Hundred Twenty Three Thousand Six Hundred Sixty Five (123,665) Shares of the Preferred Stock of FREEDOM HOLDING, INC., standing in my name on the books of said Corporation represented by Certificate(s) No.(s) 101 herewith, and do hereby irrevocably constitute and appoint JEFFREY FEINMAN, CPA, as attorney-in-fact to transfer the said certificate on the books of the within named Corporation, with full power of substitution.in-the premises
(NYSCEF Doc. No. 58, ¶ 90 [emphasis added]).
The Delaware Lawsuit Findings
Following completion of a trial in the Delaware Lawsuit, the court (Zurn, Vice Chancellor) held that Ms. Haart is not a 50% owner of Freedom. In coming to this conclusion, the Delaware court considered the language of the ERAs, the Stock Power (assuming it was effective) and Ms. Haart's testimony about certain promises and other statements allegedly made by Mr. Scaglia to make her a 50% partner. 
More specifically, in the Delaware Lawsuit, Ms. Haart sued seeking (i) a declaration that Ms. Haart and Mr. Scaglia own equal fifty percent (50%) shares of all classes of Freedom stock, [*10](ii) a declaration that Mr. Scaglia's removal of her as a Freedom director and as EWG's CEO was invalid, (iii) judicial dissolution of Freedom under Delaware law, (iv) declarations that (x) Mr. Scaglia's written consent purporting to remove Ms. Haart as a director of EWG is unlawful and without legal effect, (y) the purported removal of Haart and installation of Barbieri as the CEO of EWG is unlawful and null and void, and (z) Ms. Haart remains a director of EWG; and (v) a claim asserting breach of fiduciary duty.
In support of her assertion that she is a 50% owner of Freedom, Ms. Haart adduced (i) the ERAs, (ii) certain statements prepared by EWG employees and signed or acknowledged by Mr. Scaglia, and (iii) an email from Mr. Scaglia addressed to an investment bank representative. She argued that by signing the ERAs and making certain statements to her and a number of third parties, Mr. Scaglia ratified or acknowledge the parties' agreement to evenly split Freedom shares. In addition, and as discussed above, she argued that Mr. Scaglia could not argue that she was not a 50% owner because he had unclean hands by virtue of the fact that he had fraudulently concealed the existence of preferred shares from her. As discussed above, she also argued that she and Mr. Scaglia had a fight when she learned about the existence of the preferred stock and that he executed documents to reconcile their fight and to effectuate the equal ownership transfer that she alleged that he had promised. For his part, Mr. Scaglia argued that he did not agree to transfer half of the Freedom preferred shares to Ms. Haart. He testified that although he was willing to share the economic gains, he intended to keep control for himself, and that the Stock Power itself on its face conveyed less than 50% of the preferred stock. This he claimed was intentional (NYSCEF Doc. No. 31 at 15-16). The court rejected Ms. Haart's argument in full holding that the purpose of the ERAs was to restructure the Elite Modeling business and not to transfer any Freedom stock:
I begin with the plain language of Section 1. Section 1.1 recites that the final "structure of ownership" shall be (1) Haart and Scaglia each owning 50% of Freedom, (2) Freedom owning EWG, and (3) EWG owning the Entities. But Section 1 only prescribes transfers to accomplish the second and third parts of the structure. Section 1 promises Haart and Scaglia will transfer their EWG interests to Freedom, Section 1.1 includes an "agree[ment] to transfer" EWG shares, and Section 1.2 mandates an "assignment of Membership interest" in EWG. (As an aside, this language transferring EWG interests from Haart and Scaglia to Freedom has no practical effect: Haart and Scaglia do not own any interests in EWG.) Transferring Haart's and Scaglia's interests in EWG to Freedom would not "change the structure of ownership such that" each owned half of Freedom. Section 1 does not otherwise promise or effectuate any transfer of Freedom shares. I therefore read the clause Haart relies on to be an inaccurate recital that Haart and Scaglia already each own 50% of Freedom, in describing the final intended structure. The only extrinsic evidence suggesting the ERAs transferred Freedom stock to Haart are the insurance questionnaires Barbieri prepared and Haart and Scaglia signed. The questionnaires state, "In April 2019 50% of Freedom Holding shares have been transferred from Silvio Scaglia (who owned previously 100%) to Julia Hendler (now Julia Haart)." The 2019 and 2020 ERAs were backdated to April 1, 2019, so facially, this statement suggests the ERAs effectuated this transfer. But Haart does not contend Scaglia transferred her any preferred shares in April 2019. In fact, Haart testified that the couple delayed transferring even the common shares to Haart until after they married in June [*11]2019 for tax reasons. Haart did not know in April 2019 that Freedom had issued preferred shares. The preponderance of the extrinsic evidence proves the ERAs were intended to restructure the Elite modeling business, not reconcile the ownership of Freedom as between Haart and Scaglia. The ERAs were not intended to effectuate any transfer of Freedom shares
(NYSCEF Doc. No. 31, at 34, 38-39 [emphasis added]).
The Delaware court also expressly rejected Ms. Haart's reliance on certain third-party representations as they were inaccurate and contradicted by corporate documents that firmly established that Ms. Haart and Mr. Scaglia are not equal partners in Freedom. In addition, the court noted that the email Ms. Haart looks to is one that she herself drafted when she already knew that she was not a 50% owner of Freedom:
Beyond the ERAs, Haart points to a series of documents that state or imply that Haart and Scaglia own Freedom in equal one-half shares. To the extent Haart presents these documents to prove an unmemorialized transfer of preferred shares, I find they are insufficient to carry her burden. Documents indicating Scaglia and Haart were equal or fifty-fifty partners in Freedom appear in the record as early as 2018 and October 2019, when both sides agree that statement was false. While Scaglia had transferred common shares to Haart by then, he held all the preferred shares. The preponderance of the evidence indicates this trend continued uncorrected. She points to an email where Scaglia told a Jefferies representative: "Julia and I own an equal share of EWG through own [sic] common holding company. Julia is the CEO and the real force behind EWG success and stature in the industry. I am the non executive Chairman." But Haart drafted and urged Scaglia to make this statement; Scaglia was trying to appease his wife in the shadow of looming marital problems. At this point, Haart knew about the preferred share imbalance and thus knew the statement she was asking Scaglia to make was untrue
(id., at 39-40; at 40, n 200 [emphasis added]).
Significantly as it relates to the instant case, the court also specifically considered and rejected Ms. Haart's ratification argument because Ms. Haart failed to prove that any actionable promise had ever been made to make her a 50% partner that he could ratify:
Haart's defenses of ratification and acquiescence both fail because there was nothing to ratify or to which Scaglia could acquiesce Haart argues that by signing the ERA, and by his other statements, Scaglia ratified or acknowledged the parties' agreement to evenly split Freedom's shares. Her position is built on her incorrect reading of the ERA and other documents. Haart has not proven any agreement to evenly split Freedom's shares or voting power. Haart has failed to carry her burden to show that Scaglia ever transferred her half of Freedom's preferred shares or made an actionable promise to do so. She offers no transaction that Scaglia could ratify or acknowledge
(id., at 42-43 [emphasis added]).
Additionally, the court noted that it was Ms. Haart and not Mr. Scaglia who suffered from unclean hands:
The unclean hands doctrine does no[t] work here. As an initial matter, Scaglia has not meaningfully brought claims before the Court that he could forfeit. Haart initiated this matter. While Scaglia has counterclaimed for declaratory judgments, Haart acknowledges these are mirror images of her claims. In other words, even denying Scaglia relief under his counterclaims on unclean hands grounds would not change the conclusion that Haart has failed to carry the burden of proof on her claims. And the exercise of looking at the litigants' hands reveals dirt on Haart's. She was long aware of the Stock Power and the fact that Scaglia had one more preferred share than she did, going so far as to consult a lawyer who confirmed as much. While litigation loomed, she attempted to pressure Feinman into falsely stating Scaglia intended to transfer her fifty percent. Thereafter, she filed a petition in this Court, claiming she held half of Freedom's common shares, but neglected to mention preferred shares to her original counsel or the Court. The Amended Petition, filed by new counsel, indicated she owned half of "all classes of Freedom's stock." Haart testified she did not initially tell her replacement counsel about the Stock Power, on the theory that it was "irrelevant" until she found a copy of it
(id., at 42-46 [emphasis added]).
As to the Stock Power itself, significantly the court held that even if it was effective (which Mr. Scaglia disputed) and which the court did not need to reach, it on its face did not transfer 50% of the preferred stock:
Scaglia protests that the witness line on this document was not signed and that Haart has not introduced proof that the shares were actually delivered. See D.I. 130 at 40—48. Scaglia also attempted to distance himself from his signature, and testified he did not specifically remember signing the Stock Power. See Scaglia Tr. 279—81. In this summary proceeding, I do not reach whether the Stock Power actually transferred the shares to Haart. The only document in the record that purports to transfer any preferred stock is the Stock Power. On its face, that document contemplates a transfer of 61,832 of Scaglia's 123,665 Freedom preferred shares, giving Haart 49.9995957% of those shares. There are no other documents in the record that purport to transfer any preferred shares to Haart. Thus, at best, Haart holds one preferred share less than Scaglia does, giving him voting control over Freedom
(id., at 15, n 62; at 31 [emphasis added]). 
This matters because it means that Ms. Haart knew or should have known at the time that the Stock Power was executed that she was not a 50% owner of Freedom. Thus, she could not have been defrauded at the time it was executed.
The Delaware Court rejected Ms. Haart's claim that she was wrongfully ousted. The claim was predicated on her incorrect assertion that she was a 50% owner of Freedom, that [*12]Freedom was deadlocked and that Mr. Scaglia and Mr. Barbieri had exceeded their authority by removing her as a director. Because the court held that she was not in fact a 50% owner and that Mr. Scaglia held control of Freedom and never promised to make her a 50% owner of Freedom, her arguments failed and the court held that she was not entitled to a declaration that there was a deadlock or that her removal as a director of Freedom, as an EWG director, and as EWG's CEO were invalid.
For completeness, the Delaware court also rejected Ms. Haart's request for a declaration mirroring her Section 225 and Section 18-110 Claims or for relief under 8 Del. C. § 226 because Freedom was not deadlocked.
Shortly before the decision was issued by the Delaware court, in 2022, Ms. Haart learned that Mr. Scaglia had purportedly transferred one of Freedom's subsidiaries, SHS Asset Management (SHS), out of Freedom's ownership structure and had drained Freedom's bank account of $1.5 million. Claims predicated based on these transfers were not addressed in the Delaware Lawsuit.
The Pending Action
Ms. Haart then brought this lawsuit asserting the following eleven causes of action against Mr. Scaglia, Freedom, Mr. Feinman, DDK, and Paolo Barbieri: (i) fraudulent inducement against Mr. Scaglia, Mr. Feinman and DDK (first cause of action), (ii) fraudulent concealment against Mr. Scaglia, Mr. Feinman and DDK (second cause of action), (iii) aiding and abetting fraud against Mr. Barbieri, Mr. Feinman and DDK (third cause of action), (iv) negligent misrepresentation against Mr. Barbieri (fourth cause of action), (v) declaratory judgment that she owns at least 61,832 shares (49.9995957%) of the Freedom preferred stock against Mr. Scaglia and Freedom (fifth cause of action), (vi) breach of contract against Mr. Scaglia (sixth cause of action), (vii) breach of fiduciary duty against Mr. Scaglia (seventh cause of action), (viii) aiding and abetting breach of fiduciary duty against Mr. Feinman and DDK (eighth cause of action), (ix) unjust enrichment against Mr. Scaglia and Freedom (ninth cause of action), (x) promissory estoppel against Mr. Scaglia (tenth cause of action) and (xi) conversion against Mr. Scaglia (eleventh cause of action).
More specifically, Ms. Haart alleges that (i) she and Mr. Scaglia had an agreement that she was to be a 50% partner in Freedom as compensation for her work as EWG's CEO, (ii) Ms. Haart relied on that agreement and accepted the position as EWG's CEO based on this agreement, (iii) Mr. Scaglia transferred half of the Freedom common stock to Ms. Haart but intentionally concealed the existence of the 123,665 preferred shares which he owned, and (iv) Mr. Scaglia purported to but did not actually transfer half of Freedom's preferred stock to her when she first discovered his "fraud". In support of these allegations, Ms. Haart adduces evidence that Mr. Scaglia repeated promises to others that they were partners (NYSCEF Doc. No. 58, ¶¶ 65-77). As discussed, these "promises" are precisely what were litigated in Delaware, and the Delaware court held those alleged promises to be inactionable such that they could not be ratified by either the ERAs or the Stock Power.
Ms. Haart also claims that the Feinman Defendants facilitated this fraud by (i) representing to others that she and Mr. Scaglia were equal partners while concealing the existence of the preferred stock (NYSCEF Doc. No. 58, ¶¶ 33-41 and 156-177), and (ii) drafting the Stock Power which she says was supposed to transfer half of the preferred stock to her but which unbeknownst to her left Mr. Scaglia in control of Freedom (id., ¶¶ 75, 77). 
As discussed, Ms. Haart also seeks a declaratory judgment (fifth cause of action) against the Scaglia Defendants that she owns at least 49.9995957% of the preferred stock of Freedom. This she correctly argues the Delaware Court explicitly declined to address (id., ¶¶ 199-211). 
Ms. Haart asserts claims for breach of fiduciary duty (seventh cause of action) against Mr. Scaglia and aiding and abetting breach of fiduciary duty (eighth cause of action) against the Feinman Defendants based on Mr. Scaglia's (i) removal of $1.5 million from the Freedom account without informing her, (ii) transferring the SHS company's ownership out of Freedom without her authorization (id., ¶¶ 224-231) and (iii) not issuing the preferred shares to her. As to the Feinman Defendants, she alleges substantial assistance in that she alleges that the Feinman Defendants (i) administered the expense allocation system permitting Mr. Scaglia to charge his personal expenses to Freedom and EWG, (ii) prepared financial filings to legitimize Mr. Scaglia's expenses, and (iii) advised Mr. Scaglia on his termination of Ms. Haart's role as CEO (id., ¶¶ 232-235).
Ms. Haart's remaining claims for unjust enrichment (ninth cause of action) against the Scaglia Defendants, promissory estoppel (tenth cause of action) and conversion (eleventh cause of action) against Mr. Scaglia are based on the following allegations respectively: (i) Mr. Scaglia benefited from Ms. Haart's work as EWG's CEO and impeded the payment of management fee in the form of dividend distribution from Freedom to Ms. Haart because Mr. Scaglia is entitled to receive preferred dividends as a 50% owner before common share holders are paid, (ii) Mr. Scaglia breached the promise that she would be a 50% owner of Freedom as compensation for her work as EWG's CEO, and (iii) Mr. Scaglia converted Ms. Haart's property by not paying her management fees, not transferring 50% of Freedom preferred shares, removing $1.5 million from Freedom, and transferring SHS out of Freedom (id., ¶¶140, 237-239, and 246-255).
Discussion
I. The Scaglia Defendants' motion to dismiss (Mtn. Seq. No. 5) is granted to the extent that the fraudulent inducement (first cause of action), fraudulent concealment (second cause of action), breach of contract (sixth cause of action) and promissory estoppel (tenth cause of action) causes of action are barred by the doctrines of res judicata and collateral estoppel, and the unjust enrichment claim (ninth cause of action) must be dismissed pursuant to CPLR 3211(a)(7)
The Scaglia Defendants argue that Ms. Haart's claims must be dismissed because (i) the claims are barred by res judicata and/or collateral estoppel, or alternatively dismissal is required under CPLR 3211(a)(7) or CPLR 3211(a)(4). In her opposition papers, Ms. Haart argues that (i) the issues in this case are not identical to those in the Delaware Lawsuit because she explicitly concedes here that she is not a 50% owner of Freedom, (ii) CPLR 3211(a)(4) does not apply here because she asserts different causes of action against different defendants, and that (iii) she has adequately stated claims under New York law.
Under the doctrine of res judicata, when a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy (Reilly v Reid, 45 NY2d 24, 29 [1978]; O'Brien v City of Syracuse, 54 NY2d 353, 357 [1981]). However, a second action may not be barred even if both actions arise from an identical course of dealing, if the necessary elements of [*13]proof and evidence required to sustain recovery vary materially (Jefferson Towers, Inc. v Pub. Serv. Mut. Ins. Co., 195 AD2d 311, 313 [1st Dept 1993]).
In the Delaware Lawsuit, the gravamen of Ms. Haart's claims was whether or not she owned or was entitled to 50% of Freedom preferred stock. The ERAs and the documents that Ms. Haart adduces in support of her claims here are the exact same documents asserted in the Delaware Lawsuit. The claims unquestionably arise out the same transaction or series of transactions. It does not matter that she no longer asserts that she currently owns 50% of Freedom and that she now asserts the Mr. Scaglia promised to make her a 50% partner in Freedom and that he broke his promise and fraudulently concealed his preferred shares from her or that she alleges that he fraudulently retained voting control. As discussed above, the Delaware Court heard this argument at trial and found that she failed to prove that Mr. Scaglia ever made any actionable promise to make her a 50% partner. She does not get a second chance to prove her case here.
Stated differently, the express finding by the Delaware court matters and bars the claims sounding in breach or fraud because if there was no actionable promise, there can be no breach of that promise, or fraud as it relates to that promise. Thus, the claims sounding in fraudulent inducement (first cause of action), breach of contract (sixth cause of action) and promissory estoppel (tenth cause of action) must be dismissed. Ms. Haart's claim predicated on fraudulent concealment (second cause of action) must also be dismissed. Because Mr. Scaglia never made an actionable promise to make Ms. Haart a 50% partner, it simply does not matter whether or not she was aware of the preferred stock. And, the Delaware court also found that Ms. Haart had not been forthright even with her own lawyers about her knowledge of the preferred stock:
To the extent she asserts claims based on the Stock Power not transferring a full 50% of the preferred shares, this also must be dismissed. Given that the Stock Power disclosed the exact number of shares that are purportedly transferred and how many shares are outstanding on the face of the document, and the Delaware court's finding on this point, there simply can not be any reasonable reliance which would suggest any other understanding of what was being transferred.
The doctrine of collateral estoppel precludes a party from litigating an issue which has previously been decided against them in a proceeding in which they had a fair opportunity to fully litigate the point (Kaufman v Eli Lilly & Co., 65 NY2d 449, 455 [1985]; Gilberg v Barbieri, 53 NY2d 285, 291 [1981]; Becker v State, 274 AD2d 532, 532 [2d Dept 2000]). As discussed above, Ms. Haart had presented the ERAs and other statements made by Mr. Scaglia in the Delaware Lawsuit. The Delaware court considered and found those documents insufficient to prove that a transfer of the Freedom preferred shares was effectuated or that one was intended by such documents:
The preponderance of the extrinsic evidence proves the ERAs were intended to restructure the Elite modeling business, not reconcile the ownership of Freedom as between Haart and Scaglia. The ERAs were not intended to effectuate any transfer of Freedom shares.
Beyond the ERAs, Haart points to a series of documents that state or imply that Haart and Scaglia own Freedom in equal one-half shares. To the extent Haart presents these documents to prove an unmemorialized transfer of preferred shares, I find they are insufficient to carry her burden
(NYSCEF Doc. No. 31, at 39).
Most significantly, as discussed above, the Delaware Court rejected Ms. Haart's claim that Mr. Scaglia made an actionable promise to transfer half of Freedom's stock to her:
Haart's defenses of ratification and acquiescence both fail because there was nothing to ratify or to which Scaglia could acquiesce Haart argues that by signing the ERA, and by his other statements, Scaglia ratified or acknowledged the parties' agreement to evenly split Freedom's shares. Her position is built on her incorrect reading of the ERA and other documents. Haart has not proven any agreement to evenly split Freedom's shares or voting power. Haart has failed to carry her burden to show that Scaglia ever transferred her half of Freedom's preferred shares or made an actionable promise to do so. She offers no transaction that Scaglia could ratify or acknowledge
(id., at 42-44 [emphasis added]).
Because Ms. Haart had had a full and fair opportunity to litigate this issue in the Delaware Lawsuit, she is collaterally estopped from a second bite at the apple here. Thus, the claims sounding in fraudulent inducement (first cause of action), breach of contract (sixth cause of action) and promissory estoppel (tenth cause of action) must be dismissed. For completeness, as discussed above, the claim for fraudulent concealment (second cause of action) also must be dismissed because it is predicated on the same alleged promise which Ms. Haart failed to prove — i.e., that Mr. Scaglia ever promised to make her an equal partner. Thus, it also does not matter that the Delaware court rejected Ms. Haart's claim that Ms. Scaglia had unclean hands and thus should be estopped from denying that she was an equal partner (and instead found that it was Ms. Haart who had unclean hands) and did not address the effect of the Stock Power as to this claim because the court did find that Ms. Haart failed to prove that Mr. Scaglia promised to make her an equal partner.
However, neither the doctrine of res judicata nor collateral estoppel bar Ms. Haart's claims (i) that she owns at least 61,832 shares (49.9995957%) of the Freedom preferred shares (fifth cause of action), (ii) for breach of fiduciary duty (seventh cause of action) (iii) for conversion (eleventh cause of action) or (iv) that the Scaglia Defendants were unjustly enriched (ninth cause of action).
In reviewing a motion to dismiss pursuant to CPLR 3211(a)(7), the Court must afford the pleading a liberal construction and accept the facts as alleged in the complaint as true, accord the plaintiff the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory (Leon v Martinez, 84 NY2d 83, 87-88 [1994]). 
As discussed above, the fraudulent concealment claim (second cause of action) must be dismissed. Inasmuch as there was no actionable promise to make Ms. Haart an equal partner, there was no duty to disclose the existence of the preferred stock (see Kaufman v Cohen, 307 AD2d 113, 120 [1st Dept 2003]; Mitschele v Schultz, 36 AD3d 249, 254—55 [1st Dept 2006]). The fact that Ms. Haart and Mr. Scaglia were in an intimate relationship does not alter the analysis. As alleged, this was not a gift in contemplation of marriage. This was compensation for employment and the Delaware court already rejected the notion that there was an actionable promise to make Ms. Haart an equal partner. To the extent the fraudulent concealment is predicated on the Stock Power, this too must be dismissed as the Stock Power discloses that it was not a transfer of half the ownership of Freedom's preferred stock.
As to the declaratory judgement (fifth) cause of action, the Scaglia Defendants argue that [*14]dismissal is required because Ms. Haart does not allege that she possesses the preferred stock certificates. The argument fails. The issue at this stage is whether a judiciable controversy exists, not whether the plaintiff is entitled to a favorable declaration (CPLR 3001; see CPLR 3017[b]; North Oyster Bay Baymen's Assn. v Town of Oyster Bay, 130 AD3d 885 [2d Dept 2015]; see Bd. of Managers of 136 St. Marks Place Condo. v St. Marks Place Condos., II, LLC, 128 AD3d 877, 879 [2d Dept 2015]). Indeed, inasmuch as Mr. Scaglia controls Freedom, having failed to issue stock certificates in respect of the stock purportedly conveyed by the Stock Power, he can not seriously dispute her ownership on the grounds that he either does not "remember" signing the Stock Power or based on his failure to cause the stock certificates to be issued by the Feinman Defendants or by the Board that he controls.
Ms. Haart's claim against Mr. Scaglia for breach of fiduciary duty (seventh cause of action) is also not ripe for dismissal. As discussed above, Ms. Haart's claim for breach of fiduciary duty is based on the allegation that Mr. Scaglia had unilaterally removed $1.5 million from the Freedom account and transferred the SHS ownership out of Freedom as Freedom's director. This is sufficient to state a claim for breach of fiduciary because the funds and interests are allegedly transferred from Freedom without lawful and legitimate corporate purposes (Auerbach v Bennett, 47 NY2d 619, 629 [1979]; see Consumers Union of U.S., Inc. v State of New York, 5 NY3d 327, 327 n 20 [2005]; Matter of Levandusky v One Fifth Ave. Apt. Corp., 75 NY2d 530, 538 [1990]). Mr. Scaglia's argument that he does not owe Ms. Haart fiduciary duties is just wrong. Ms. Haart is unquestionably a shareholder of Freedom (even were this Court to find the Stock Power ineffective) and as such is owed fiduciary duties.
Ms. Haart's claim for unjust enrichment (ninth cause of action) must be dismissed. To state a claim for unjust enrichment, the plaintiff must show (i) the defendant was enriched (ii) at plaintiff's expense, and that (iii) it is against equity and good conscience to permit the defendant to retain what is sought to be recovered (Mandarin Trading Ltd. v. Wildenstein, 16 NY3d 173, 182 [2011]; Georgia Malone & Co. v Ralph Rieder, 86 AD3d 406, 408 [1st Dept 2011]). As discussed above, Ms. Haart alleges that her work as the CEO gave rise to a management fee payable from EWG to Freedom at a sum equivalent to 2% of EWG's annual gross worldwide revenue pursuant to a management fee agreement, which was then paid out to Mr. Scaglia as preferred dividends (NYSCEF Doc. No. 58, ¶¶ 34, 140). This does not state a claim for unjust enrichment. The management fee was payable to Freedom, Freedom's value was enhanced and the reflective value of Ms. Haart's equity was enhanced. Therefore, the payment of the management fee did not unjustly enrich any of the defendants. To the extent that she complains that Mr. Scaglia gets more of the benefits of the management fee than she does based on his equity, this is either another version of her claim that she and Mr. Scaglia were supposed to be equal partners and/or otherwise had a different business deal than is reflected in the documents which according to the Delaware Court, is not so, or to the extent of any inappropriate distributions to Mr. Scaglia, this sounds in breach of fiduciary duty. Either way, the claim must be dismissed.
The claim for conversion (eleventh cause of action) is not subject to dismissal at this stage. To state a claim for conversion, the plaintiff must show (i) legal ownership or an immediate superior right of possession to a specific identifiable thing and (ii) that the defendant exercised an unauthorized dominion to the exclusion of the plaintiff's rights (Independence Discount Corp. v Bressner, 47 AD2d 756, 757 [2d Dept 1975]; Schwartz v Sayah, 72 AD3d 790, 791, 899 [2d Dept 2010]). As discussed above, Ms. Haart alleges that Mr. Scaglia took [*15]corporate property without authority or corporate purpose and transferred it to himself, irrespective of Ms. Haart's rights as a Freedom shareholder. This is sufficient at this stage of the proceeding to state a claim for conversion (eleventh cause of action).
Pursuant to CPLR 3211(a)(4), a court has broad discretion in determining whether an action should be dismissed on the ground that there is another action pending between the same parties for the same cause of action (see Whitney v Whitney, 57 NY2d 731, 732 [1982]; Cherico, Cherico & Assoc. v Midollo, 67 AD3d 622 [2d Dept 2009]). A court may dismiss an action pursuant to CPLR 3211(a)(4) where there is a substantial identity of the parties, the two actions are sufficiently similar, and the relief sought is substantially the same (see Scottsdale Ins. Co. v Indemnity Ins. Corp. RRG, 110 AD3d 783, 784 [2d Dept 2013]; In re Matter of Willnus, 101 AD3d 1036, 1037 [2d Dept 2012]). Simply put, dismissal is not appropriate pursuant to CPLR 3211(a)(4) based on the Delaware Lawsuit as to the claims not otherwise barred because the Delaware Lawsuit is no longer pending and these claims were never before the Delaware court.
II. The Feinman Defendants' motion (Mtn. Seq. No. 006) to dismiss must be granted to the extent that the claims for fraudulent inducement (first cause of action), fraudulent concealment (second cause of action) and aiding and abetting fraud (third cause of action) must be dismissed pursuant to CPLR 3211(a)(7)
Ms. Haart's claim for fraudulent inducement (first cause of action) against the Feinman Defendants must be dismissed pursuant to CPLR 3211(a)(7). The argument that the Feinman Defendants fraudulently induced Ms. Haart into taking the job as CEO fails. Mr. Feinman was Freedom's accountant. The parties do not dispute that Mr. Feinman and his company did not have the capacity to either promise to transfer Freedom ownership or appoint anyone as EWG's CEO. Thus, the claim must be dismissed. The claim for fraudulent concealment (second cause of action) must also be dismissed because her claim that the Feinman Defendants fraudulently induced her to believe in equal ownership and concealed the number of preferred shares is inherently incredible and contradicted by documentary evidence (Caniglia v Chicago Tribune—New York News Syndicate, 204 AD2d 233, 233—234 [1st Dept 1994]; Summit Solomon & Feldesman v Lacher, 212 AD2d 487, 487 [1st Dept 1995]). On its face, the Stock Power unequivocally indicates (i) the number of Freedom preferred shares purportedly to be transferred and that of the total preferred shares, and (ii) Ms. Haart appoints Mr. Feinman as attorney-in-fact to transfer the stock certificates (NYSCEF Doc. No. 58, ¶ 90). As such, Mr. Feinman could not have concealed the number of Freedom preferred shares from Ms. Haart. Equally important, the Delaware Court found that Ms. Haart had tried to cause Mr. Feinman to falsely represent to others that she was an equal owner of Freedom. Thus, the Feinman Defendants can not be said to have falsely induced her into believing otherwise.
The claim for aiding and abetting fraud (third cause of action) against the Feinman Defendants must be also dismissed because it is predicated on the allegation that Mr. Feinman and DDK assisted Mr. Scaglia with his alleged frauds. Because the fraud claim must be dismissed, the aiding and abetting claim must also be dismissed. 
The claim for aiding and abetting breach of fiduciary duty (eighth cause of action), however, is not subject to dismissal. As alleged, the Feinman Defendants provided substantial assistance to the Scaglia Defendants by drafting documents and manipulating the books to permit Mr. Scaglia to use Freedom assets to pay his own personal expenses and by failing to issue stock certificates [*16]in respect of the preferred stock.
It is hereby ORDERED that the Scaglia Defendants' motion to dismiss (Mtn. Seq. No. 005) is granted solely to the extent that the claims for fraudulent inducement (first cause of action), fraudulent concealment (second cause of action), breach of contract (sixth cause of action), unjust enrichment (ninth cause of action) and promissory estoppel (tenth cause of action) against Mr. Scaglia and Freedom are dismissed; and it is further
ORDERED that the Feinman Defendants' motion to dismiss (Mtn. Seq. No. 006) is granted solely to the extent that the claims for fraudulent inducement (first cause of action), fraudulent concealment (second cause of action) and aiding and abetting fraud (third cause of action) against Mr. Feinman and DDK are dismissed; and it is further
ORDERED that the defendants are directed to serve an answer to the Second Amended Complaint within 20 days after service of a copy of this order with notice of entry; and it is further
ORDERED that counsel are directed to appear for a preliminary conference on April 13, 2023, at 11:30 AM.
DATE 2/27/2023
ANDREW BORROK, J.S.C.